58 CCPA

**Application of Victor V. D'ANCICCO, William G. Collings and Daniel Robert Shine.**

**Patent Appeal No. 8460.**

United States Court of Customs and Patent Appeals.

April 8, 1971.

Rehearing Denied June 3, 1971.

George T. Johannesen, Kalamazoo, Mich., attorney of record, for appellant;

John Kekich, Kalamazoo, Mich., of counsel.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents; Jack E. Armore, Washington, D. C., of counsel.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and FORD, Judge, United States Customs Court, sitting by designation.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the examiner's rejection of claims 4, 5, 9, 10, and 12 in appellants' application serial No. 520,085, filed January 12, 1966, as a continuation-in-part of their copending application, serial No. 120,524, filed June 29, 1961, for rigid polyurethane foams and a method for making them. We affirm.

## THE INVENTION

The methods recited in claims 9 and 10 for making the products recited in claims 4 and 5 comprise the reaction of specified polyisocyanates and specified polyhydroxy compounds. The foams and the methods for making them are said to distinguish over the prior art solely in the composition of the polyisocyanate reactant, which is the subject of claim 12. Accordingly, we reproduce only claim 12 [1] as adequately exemplificative

---

1. Appellants withdrew claims 1–3, 6–8, and 11 at the hearing before the board, leaving for consideration only dependent claims. Appellants shortly thereafter and long before the decision of the board was handed down offered to amend the remaining claims to eliminate the dependency on withdrawn claims. Their proposed amendment was not entered, for some unexplained reason, but, nonetheless, the board's opinion reproduces two of the amended claims as illustrative, apparently treating them as if they had been entered. On appeal here, the transcript of record contains only the rejected claims in their original, dependent form. We recently affirmed the rejection of a dependent claim on the ground that appellant's failure to have the allowed claim

from which it depended printed in the record prevented us from evaluating the correctness of the obviousness rejection there in issue. In re Andrews, 435 F.2d 1322, 58 CCPA (1971). However, appellant's action there was clearly contrary to Rule 26(3) of this court, while the action of appellants here was not, and appellants here have included in their brief the withdrawn claims upon which the appealed claims depend. The solicitor's brief calls our attention to three small errors in appellants' printing of one of the withdrawn claims, but otherwise does not object to appellants' procedure. Accordingly, no harm apparently having been done by appellants' omission of the withdrawn claims in the transcript, we will consider the rejected

for purposes of this appeal (rewritten in independent form as explained in footnote 1, subparagraphing supplied by us):

A mixture of diisocyanates, triisocyanates, and higher molecular weight polyisocyanates

produced by the phosgenation of the mineral acid-rearranged product of condensation of aniline and formaldehyde in proportions to give a product

with from 50 to 55 parts of said mixture being a diisocyanate and

with a combined amount of diisocyanate and triisocyanate being from 60 to 75 parts per hundred parts of the mixture; and

with the remainder of the mixture being of sufficiently high molecular weight that the number average molecular weight for the mixture is at least 381;

said mixture having

a viscosity of less than about 1090 centipoises at 25°C. and

an isocyanate equivalent of 127 to not higher than 140.

Use of this particular polyisocyanate mixture in a process conceded to be old for the production of polyurethane foams except for the specific polyisocyanate ingredient is said to result in rigid foams.

* * * which[,] over periods of continued exposure to relatively high temperatures of about 400°F., are characterized by retention of rigidity or nonflexibility, of high compressive strength and[,] in the case of our improved foams that have been cured at relatively high temperatures, good dimensional stability.

Since, additionally, the specific polyisocyanate ingredient is quite close to polyisocyanate ingredients disclosed in the prior art as useful for the production of polyurethane foam, appellants have attempted to rebut the inference of obviousness to be drawn from this similarity by filing Rule 132 affidavits comparing certain properties of polyurethane foams made according to their disclosure with polyurethane foams made according to the disclosures of the references. These affidavits, they argue, demonstrate the superiority of their invention to the prior art, which suggests that their invention would have been made sooner if it had been obvious in view of the prior art.

## THE REJECTIONS

The examiner rejected all claims over various combinations of eight references. The board affirmed the rejections on the basis of only four of the eight, stating that the other art rejections were "cumulative, at best," and the parties have agreed that the additional references and the rejections based thereon "require no further consideration herein." Accordingly, the references here are:

| Seeger et al. | 2,683,730 | July 13, 1954 |
|---|---|---|
| Abbotson et al. (Australia) | 221,411 | May 15, 1958 |
| French Patent | 1,233,854 | May 9, 1960 |
| Chapman et al. (Great Britain) | 874,430 | Aug. 10, 1961 [2] |

Additionally, the examiner rejected claims 1, 6, and 11 under 35 U.S.C. 132 as "containing new matter by the insertion of the recitation '1090' for '1000' in the specification" and claims 6–10 as "merely reciting an obvious method of preparing a polyurethane foam," citing In re Farkas, 368 F.2d 1016, 54 CCPA 845 (1966), In re Larsen, 292 F.2d 531, 49 CCPA 711 (1961), and section 706.03 (q) of the Manual of Patent Examining Procedure. The board affirmed both rejections insofar as they still applied after appellants' withdrawal from issue of most of the claims, reading the new matter rejection as applying to claims 4, 5, 9, 10, and 12 as well as 1, 6, and 11 be-

dependent claims in conjunction with the withdrawn claims printed in appellants' brief as modified by the solicitor's corrections.

2. The British specification, published after the filing date of this application's parent, was used below and is used here simply as a convenient translation of the French patent, which is the true reference.

cause all are dependent from the rejected claims and thus incorporate the challenged language by operation of law. 35 U.S. C. 112. Our resolution of the first issue renders unnecessary consideration of the second and third issues.

### THE REFERENCES

Abbotson discloses how to make polyurethane foams by reacting a polyester with a polyisocyanate mixture "comprising a major proportion of diphenylmethane diisocyanate and at least 5% by weight of polyisocyanate of functionality greater than two * * *." It will be recalled that claim 12 recites a mixture of polyisocyanates "with from 50 to 55 parts of said mixture being a diisocyanate and with a combined amount of diisocyanate and triisocyanates being from 60 to 75 parts per hundred parts of the mixture," indicating that the percentage of triisocyanate in the mixture would be between 5 and 25 percent. Abbotson states that

> The method whereby the polyisocyanate of functionality greater than two is introduced into the polyisocyanate composition is not critical, provided the content thereof is between 5% and 50% by weight of the composition (preferably between 15% and 40%).

Additionally, one of the four methods disclosed by Abbotson for preparing the requisite polyisocyanate mixture is the "phosgenation of crude diaminodiphenylmethane" to produce diphenylmethane diisocyanate, during which process "triamines and other polyamines are also phosgenated and give rise to polyisocyanates of functionality greater than two." It will also be recalled that claim 12 recites the production of the polyisocyanate mixture "by the phosgenation of the mineral acid-rearranged product of condensation of aniline and formaldehyde * * *."

Chapman is similar to Abbotson except that it discloses the use of a polyether rather than a polyester as the other reactant. Specifically, it discloses how to produce a rigid polyurethane foam using a diphenylmethane diisocyanate composition "prepared by phosgenating crude diaminodiphenylmethane, containing about 15% of polyamines (mainly triamines) obtained by condensing formaldehyde with aniline in the presence of hydrochloric acid."

Seeger teaches how to make polyisocyanate mixtures "which contain a controlled maximum amount of the diisocyanate." Thus, it is directly relevant to claim 12 and relevant to the other claims on appeal (1) by virtue of the disclosure in Abbotson and Chapman that mixtures of polyisocyanates may be used in the preparation of rigid polyurethane foams and (2) by virtue of its own statement that the polyisocyanate mixtures there disclosed "may be used to advantage in polymeric reactions with compounds containing reactive hydrogens," which statement generally describes the reactions of claims 9 and 10. It teaches that such polyisocyanate mixtures may be prepared by reacting an aryl mono primary amine (such as aniline) with an aliphatic or aromatic aldehyde (such as formaldehyde) or ketone to yield a mixture of secondary polyamines which are then "subjected to rearrangement to primary polyamines by means of a mineral acid," the primary polyamines in turn being "phosgenated to the polyisocyanates." We note a remarkable similarity between what is stated in the previous sentence and the first subparagraph following the preamble in claim 12, supra. However, it must be conceded that Seeger teaches that the aryl mono primary amine reactant and the aldehyde or ketone reactant must be present "in controlled molecular amounts" different from appellants' amounts. This is because Seeger's invention

> * * * is concerned with the formation of mixtures of polyisocyanates in which the *diisocyanate portion is present in an amount not to exceed approximately 40% by weight of the mixture.* This is accomplished by controlling the molecular ratio of amine to aldehyde or ketone in a range of from 4:2.5 to 4:3.5 with the amine being

present in the larger molecular amount. A ratio of 4:2.5 yields a mixture of polyamines containing approximately 40% diamine by weight, while increasing the aldehyde or ketone to a ratio of 4:3.5 yields a mixture containing approximately 15% diamine by weight, with the balance in each case being the triamine, and higher amines. The polyamine mixtures are reacted with phosgene, as indicated, to obtain a mixture of polyisocyanates. [Emphasis ours.]

## OPINION

Appellants argue that Abbotson and Chapman do not really teach how to make polyisocyanate mixtures in which the percentage of diisocyanate is lower than about 70% and that Seeger does not teach how to make mixtures in which the percentage of diisocyanate is higher than 40%. "What bridges this no-man's-land?" appellants ask, answering that only their disclosure does and that, particularly in view of their Rule 132 affidavits showing the superiority of polyurethane foam made from a polyisocyanate mixture containing 50–55% diisocyanate, they are entitled to a patent in return for their disclosure.

Appellants' arguments concerning Abbotson and Chapman attack the operativeness of the first three methods disclosed by the patentees for preparing polyisocyanate mixtures containing less than 70% diisocyanate. Since the fourth method in both patents is essentially their method, they do not challenge its operativeness, but they do argue that the broad terms in which it is there disclosed refer only to the manner in which diphenylmethane diisocyanate is "traditionally" made, which they assert yields a product containing about 85% diisocyanate. The board rejected that argument, stating that it agreed with the examiner

* * * that method 4 must be read in the general context of a polyisocyanate composition with a 5 to 50% content of higher isocyanates and that

the art at that time was aware of how to vary the relative proportions of the isocyanate compounds, as evidenced by Seeger et al.

We agree with the board. Seeger was available to the art well before the filing date of either Abbotson or Chapman and there is nothing in either to suggest that the patentees intended to limit their disclosure to what appellants now say was "traditional." Similarly, while Seeger expressly teaches only the preparation of polyisocyanate mixtures with a diisocyanate content no greater than 40%, there is nothing in Seeger to suggest that similar techniques would not work for the preparation of polyisocyanate mixtures with a greater diisocyanate content. Accordingly, we conclude that appellants' claim 12 is at least prima facie obvious in view of the prior art.

To overcome the inference of obviousness arising from the close similarity of the subject matter of claim 12 to the prior art, appellants filed two Rule 132 affidavits comparing polyurethane foams made from polyisocyanate mixtures meeting the terms of claim 12 with polyurethane foams made according to the disclosures in Abbotson and Chapman. Essentially, these affidavits indicate (1) that appellants' foams exhibit both greater compressive strength and less proportionate reduction in compressive strength at elevated temperatures than do the foams with which they were compared and (2) that appellants' foams char at still higher temperatures, whereas the foams with which they were compared melt.

The board discounted appellant's Rule 132 affidavits for two reasons, first, "because they do not take cognizance of possible variation in method 4 of the references," and, second, because they do not indicate that the properties of the composition are "strikingly altered" as compared with the prior art. Since the "possible variations" to which the board referred would have resulted, in the board's own words, in the appellants'

"merely * * * comparing the claimed subject matter with itself," [3] the question really is whether making those variations would have been obvious at the time appellants made them to others having ordinary skill in the art of polyurethane foam making.

Appellants have argued that their polyurethane foam is "markedly superior to anything disclosed in the references or the tested variations thereof," which, if true, would suggest that preparation of appellants' foam must have been unobvious or it would have been done sooner. On the other hand, the solicitor has vigorously supported the board's assessment that the properties of appellants' foam are not "strikingly altered," which, if true, would greatly weaken if not destroy the inference of nonobviousness to be drawn from the lack of earlier development. Unfortunately, we do not have the evidentiary wherewithal to evaluate either position.

The evidence shows that appellants' foam chars at elevated temperatures, whereas the foam "disclosed in the references * * * [and] the tested variations thereof" melt. Appellants' brief baldly states that "A product which gives a 'solid char' as opposed to melting and cavitation [when the prior art foams melted, it left cavities in the test materials where melting occurred] is definitely a superior product," the implication being that if others in the art could have come up with a product which would char instead of melt, they certainly would have done so. Similarly, the affidavits show that appellants' foams exhibit both greater compressive strength at room temperature and less proportionate reduction in compressive strength at elevated temperatures than do the foams *with which they were compared.*

Accepting these facts as true, they do not establish that the claimed mixtures were unobvious in view of the prior art. All this record definitely establishes is that appellants' foams have *different* properties from the reference foams tested. Whether this difference was "striking" depends, not alone on the numerical ratio of the quantified value of the property being compared, but on the significance of that difference. In this case, there has been no showing that either of the asserted differences between appellants' foams and the prior art foams is of any practical advantage, and appellants' attempt to rebut prima facie obviousness by the method sanctioned in In re Papesch, 315 F.2d 381, 50 CCPA 1084 (1963), therefore fails.

If the polyisocyanate mixture claimed in claim 12 was obvious in view of the prior art, as we find, so were the polyurethane foams of claims 4 and 5 and the processes for their manufacture of claims 9 and 10, for it has been conceded that their sole point of novelty was the polyisocyanate composition.

The decision of the Board of Appeals is therefore affirmed.

Affirmed.

3. Appellants have not argued that modifying the disclosure of Abbotson or Chapman in accordance with Seeger's teaching of the relationship between the aniline and formaldehyde components of the initial reaction, quoted supra at page 8, to obtain a diisocyanate content between 50 and 55 percent in the polyisocyanate composition would not result in a polyisocyanate mixture meeting the other requirements of the claim.