59 CCPA

**Application of Eugene J. KLOSAK.**

**Patent Appeal No. 8582.**

United States Court of Customs and Patent Appeals.

March 9, 1972.

Charles W. B. Connors, Chicago, Ill. (Johnston, Root, O'Keeffe, Keil, Thompson & Shurtleff, Chicago, Ill.), attorneys of record, for appellant.

S. Wm. Cochran, Washington, D. C., son & Shurtleff), Chicago, Ill., attorneys E. McKelvey, Washington, D. C., of counsel.

Before WORLEY, Chief Judge, and RICH, ALMOND, BALDWIN and LANE, Judges.

BALDWIN, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the examiner's rejection of claims 1–6 of appellant's application[1] as unpatentable under 35 U.S.C. § 103. No claims have been allowed.

## THE INVENTION

The claims are directed to a method of producing silica sols by contacting aqueous solutions of alkali metal silicates with ion exchange resins. Claim 1 reads as follows (paragraphing ours):

An improved continuous method for producing colloidal silica sols which comprises the steps of

contacting an aqueous solution of alkali metal silicate containing at least 5.0% solids expressed as $SiO_2$ by flow through a resinous body of an acid-regenerable cation exchange material in the hydrogen form,

collecting the resultant acid silica sol effluent,

terminating said flow of silica when [the] capacity of said resin is exhausted as indicated by a first drop in conductivity of said sol effluent,

backwashing said resin with water to remove substantially all unreacted alkali metal silicate entrapped therein,

regenerating said resin with a mineral acid to an original cation exchange capacity efficiency of at least 60%,

rinsing said resin with water being at least substantially free of ions causing hardness in order to free said resin of residual acid, and

repeating said process steps in a continuous manner.

Each of the remaining claims depends on claim 1. Claim 2 recites that the flow of silica is terminated when the conductivity of the effluent first measures 150–400 mmhos. Claim 3 recites that the backwashing is continued until the alkalinity of the backwash effluent reaches a certain level. Claim 4 recites that the rinsing is continued until the acidity of the rinse effluent reaches a certain level. Claim 5 gives the concentration of the alkali metal silicate as 5–8% and specifies sulfuric acid as the acid regenerant. Claim 6 requires the rinsing step to be conducted at about the same flow rate as the acid regeneration step, and adds a second rinsing step to be conducted at about the same flow rate as the backwashing step.

## THE REFERENCES

Trail[2] is directed to methods of making colloidal silica sols. An aqueous sodium silicate solution containing up to about 4% sodium silicate is passed through a bed of cation exchange resin which is in the hydrogen form. In each cycle, the flow of solution is continued until the capacity of the ion exchange resin drops to a point where the alkali metal silicate begins to break through the bed without appreciable adsorption of alkali metal ions by the resin. The decision to stop the flow is made by monitoring the pH of the effluent. The resin bed is then backwashed with water. The resin is next regenerated with a dilute mineral acid, sulfuric and hydrochloric acids being specifically mentioned. Then the excess acid is rinsed out of the bed with water. According to Trail, this cycle can be repeated many times. In order to maximize the concentration of the silica sols thus produced, Trail recycles the majority of the effluent colloidal silica sols, adding a solution of sodium silicate to them and feeding them back into the ion exchanger. Before the colloidal silica sols are recycled they undergo a heat treatment and their pH is raised to slight alkalinity.

1. Serial No. 541,858, filed April 11, 1966.

2. U.S. Patent No. 2,573,743, patented November 6, 1951, on an application filed July 31, 1948.

Kimberlin[3] is also directed to the making of colloidal silica sols. Unlike Trail, Kimberlin directly acidifies the sodium silicate solution with acid to produce the colloidal silica sol. The acidified liquid, including the silica sol, is then put through a cationic exchange resin in the acid form in order to remove the sodium ions from the mixture. Kimberlin is not relied on for his specific silica sol process, but rather for his suggestion that the silica sol effluents from ion exchangers can be monitored by "various instrumental means which depend upon the electrical conductivity, pH, or other property of the hydrosol effluent from the exchange zone." The board also relied on the Kimberlin patent for its disclosure concerning the degree to which ion exchange resins should be regenerated.

Both the Trail and Kimberlin patents contain discussions of the state of the art at the time their inventions were made. Both of these discussions support appellant's contention that the useful life of the cation exchange material was reduced when production of silica sols of a concentration greater than about 3% was attempted. Both references allude to gel formation in the resin bed as the source of the problem.

## THE REJECTION

All of the claims stand rejected under 35 U.S.C. § 103 as unpatentable over Trail in view of Kimberlin. The examiner considered that Trail taught generally the steps of the claims with the exception of the use of electrical conductivity to monitor the effluent from the resin bed. This alternative was considered obvious from the Kimberlin teachings. The examiner stated that an affidavit purporting to show that the Trail process was inoperative at higher silicate concentrations did not rebut the basis of the obviousness rejection.

The board took a similar view. In answer to appellant's contention that the regeneration of the ion exchanger to at least 60% of its original capacity was the "key" to his invention and was not taught by either reference, the board pointed out that Kimberlin apparently regenerated to a greater degree than was done in the sole example in appellant's specification. In a request for reconsideration, appellant conceded that Kimberlin may in fact regenerate to above 60%, but argued that because of his different silica sol process, Kimberlin is concerned with "nonrelated technology." On reconsideration, the board was of the opinion that the precise manner in which the ion exchanger resin became exhausted was not important in considering Kimberlin's teachings regarding resin regeneration.

## OPINION

We find that the Kimberlin patent is solid evidence that the use of changes in effluent conductivity to monitor ion exchange columns was considered an obvious alternative to pH measurement, the method used by Trail. Kimberlin also indicates that it was known in the art to regenerate the ion exchange resins to a high degree. Appellant's argument that the Kimberlin teachings should not be considered because the Kimberlin process is different from appellant's process is without merit. The Kimberlin patent is clearly part of the art to which one of ordinary skill would turn should he have problems with regeneration, for example, in the Trail process. Further, there is nothing in the Kimberlin patent itself which would indicate that its teachings regarding monitoring and regenerating in exchangers should be limited to the specific sol producing process disclosed. The Patent Office has therefore established a strong prima facie case that it would have been obvious to use conductivity control in the Trail process and to regenerate his resin above 60%. It is abundantly clear from the record that the art would have recognized that the Trail process so modified would have produced

3. U.S. Patent No. 2,726,216, patented December 6, 1955, on an application filed July 31, 1951.

colloidal silica sol from solutions containing 5% silicate, the only question being how long it could operate at that high a concentration.

■ Turning to rebuttal evidence, appellant points out that statements in both the Trail and Kimberlin patents indicate that the prior art found it impractical to use concentrations of alkali metal silicate greater than about 3% in the feed to the ion exchanger. These statements tend to establish that the results appellant alleges that he obtains would not have been expected by those skilled in the art. This evidence has not been effectively rebutted by the Patent Office. However, as the board pointed out:

> While Appellant refers to operation in a continuous manner 'for a long period of time,' [his sole] specific example describes but a single run. No data are presented showing that the results of this example are reproducible for more than the 'few passes' attributed to prior art procedures when applied to sodium silicate solutions containing 5–6% silica.

Thus appellant has not shown that his process in fact gives results which differ from those obtained by the prior art.

■ The fact that an invention provides results which would not have been expected by those skilled in the art is strong evidence in rebuttal of an assertion that the invention would have been obvious. However, the burden of showing unexpected results rests on he who asserts them. Thus it is not enough to show that results are obtained which differ from those obtained in the prior art: that difference must be shown to be an *unexpected* difference. In re D'Ancicco, 58 CCPA 1057, 439 F.2d 1244, (1971). Nor is it enough to show that certain results would not have been expected by those skilled in the art without establishing that those results are actually obtained through one's invention.

The record in this case, particularly the statements in the Trail and Kimberlin patents regarding the state of the art, supports the conclusion that those skilled in the art would not have expected that the ion exchange process could be operated on a practical basis using concentrations of alkali metal silicate significantly greater than three or four percent. However, since appellant has not established such an actual difference in results between the use of his invention on such solutions and the use of the processes of the prior art on such solutions as to render the operation practical, he has not rebutted the prima facie case of obviousness established by the Patent Office. The board's decision is therefore affirmed.

Affirmed.