**1380**

Application of Michel JUILLARD
and Jean Legros.

Patent Appeal No. 8881.

United States Court of Customs
and Patent Appeals.

May 3, 1973.

Herman Hersh, McDougall, Hersh & Scott, Chicago, Ill., attorneys of record, for appellants; Keith V. Rockey, Chicago, Ill., George A. Degnan, Arlington, Va., of counsel.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents; Jack E. Armore, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, ALMOND, BALDWIN and LANE, Judges.

BALDWIN, Judge.

This appeal is from the decision of the Patent Office Board of Appeals, affirming the examiner's rejection under 35 U.S.C. § 103 of claims 1, 3–7 and 9–12, all of the claims in appellants' application.[1] We affirm.

## The Invention

Appellants' invention concerns the addition of a particular type of alumina to polymers and copolymers of polyvinyl chloride. Product claim 7 is sufficiently representative:

> 7. A polymeric plastic material formed of a polymer or copolymer of polyvinyl chloride and an alumina in the form of a hydrargillite uniformly distributed throughout the plastic material in an amount within the range of 0.05[2] to 10 per cent by weight of the plastic material and in which the alumina has a pseudo-hexagonal lamella and a BET specific area within the range of 30 to 50 m$^2$/g, a diameter within the range of 500 to 2000 Å and a thickness within the range of 100 to 300 Å.

It is contended that the addition of that particular type of alumina to the polymers has at least two beneficial effects: increase in impact strength and decrease of the "gellification" time. Claim 1 states "In the method of increasing the rate of gellification of polyvinyl chloride comprising working the polyvinyl chloride * * *" having 0.5 to 10 weight percent of the form of alumina specified in claim 7 uniformly distributed throughout the polymer. It is unnecessary to detail here the additional recitations found in claims 3–6 and 9–12.

## The Prior Art

Yngve[3] relates to fillers for use in certain vinyl resins, particularly "con-

---

1. Serial No. 588,666, filed September 30, 1966.

2. The board stated that this recited lower limit was an "obvious error" and presumed for purposes of the appeal that the correct range is 0.5–10 percent. We have also so assumed.

3. U.S. Patent No. 2,370,280, issued February 27, 1945.

joint" polymers of vinyl chloride with vinyl acetate. The patent states:

> According to this invention, it has been found that plastic compositions containing finely divided or colloidal aluminum hydrates intimately associated with the vinyl resins are characterized by the desired properties of increased impact strength and attractive surface luster.

Data is presented showing that resin compositions containing alumina in various amounts from 5% to 20% had greater impact strength than the same resin composition without any alumina. Yngve states that the alumina used "may be selected from any of the grades available * * *." No particular method of incorporating the alumina into the resin is mentioned.

Michel et al. (Michel)[4] relates to a method of producing the alumina hydrargillite in the form of crystals of high chemical purity. Concerning the crystals obtained, which are referred to as "lamellar bod[ies] of regular structure," Michel states:

> Their maximum dimensions in the plane, directly measured according to photographs on the electronic microscope actually range from 200 to 1000 A. and, from measurements of their specific surfaces, their thickness can be deduced and has been found to vary form [sic] 100 to 200 A.

The patent also states that "this alumina variety is used as a filming agent and as a charge and pigment."

Schildknecht[5] describes the use of two-roll mills in high polymer processing. The reference states that thermoplastic resins, including vinyl chloride resins, are often compounded on mills.

### The Rejection

Claims 1 and 3–6 were rejected as unpatentable, under section 103 of the stat-

ute, over Yngve in view of Schildknecht. Claims 7 and 9–12 were rejected under that section as unpatentable over Yngve, alone or in view of Michel.[6] The examiner was of the view that it would have been obvious to use the Michel alumina as the alumina in Yngve. The examiner stated that appellants had failed to show that the combination of the hydrargillite claimed with polyvinyl chloride resins gives unexpected results as compared with the combination of other aluminas with polyvinyl chloride resins. The board agreed with and amplified the examiner's position. With regard to the rejection of process claims 1 and 3–6, the board said:

> By combining Yngve with Schildknecht, the Examiner's position appears to be that, although Yngve does not say how he incorporates the hydrated alumina in the resin, one having ordinary skill would normally do so by the most widely used ways of blending or compounding such materials and that these ways involve working, as shown by Schildknecht. His conclusion is that the invention as a whole would have been obvious to a person having only ordinary skill in the art. Absent some evidence that the contendedly unobvious results are unique to the particular alumina hydrate employed, or at least that they are not shared by the alumina hydrates available prior to Michel et al., we agree with this conclusion, and will sustain the rejection.

### Opinion

The evidence in this record that the claimed invention would have been obvious is clearly sufficient to establish a prima facie case. Yngve calls for the combination of *any* available grade of alumina with his polyvinyl chloride film, and the high grade hydrargillite de-

---

4. U.S. Patent No. 3,411,876, issued November 19, 1968, on an application filed May 25, 1964.

5. Schildknecht, Polymer Processes, pp. 700–01 (1956).

6. Certain alleged admissions in appellants' specification were relied on as an alternative to reliance on the Michel patent. The view we take of the case renders it unnecessary to consider this alternate ground of rejection.

scribed in Michel would seem eminently suited for such use.

We must also conclude that the case for obviousness has not been rebutted by appellants. In In re Freeman, 474 F.2d 1318 (C.C.P.A.1973), we said:

> In order for a showing of "unexpected results" to be probative evidence of non-obviousness, it falls upon the applicant to at least establish: (1) that there actually is a difference between the results obtained through the claimed invention and those of the prior art, In re Klosak, 455 F.2d 1077, 59 CCPA 862 (1972); and (2) that the difference actually obtained would not have been expected by one skilled in the art at the time of invention, *Id.*; In re D'Ancicco, 439 F.2d 1244, 58 CCPA 1057 (1971).

In that case we found that the evidence presented met the above conditions and was thus *probative* on the question, but was insufficient to rebut a strong evidentiary case for obviousness. Here we find that appellants have failed to establish that the evidence they present is probative on the question of obviousness.

Appellants contend that their evidence demonstrates unexpected results both with regard to impact strength and to a reduction in gellification time. Appellants' main case concerning impact strength deals with a comparison of certain test results reported in their specification with test results reported in the Yngve patent. As the board stated:

> [T]he data in the specification herein is not directly comparable to that in the patent since it would be reasonable to expect differences in physical properties explainable on the basis of differences in composition or molecular weight of resin, presence or absence of plasticizers or amounts of the latter, etc., all of which are uncontrolled when trying to compare what appellants have done with what the reference reports.

While appellants ostensibly agree that no *direct* comparison can be made, at one point in their brief they attempt to give the impression that the only reason the tests are not directly comparable is that the test results are reported in different units. We have examined the description of the tests presented in the record. We agree with the differences in conditions noted by the board and further note that there are significant differences in the testing methods themselves, such as the way in which the samples are prepared. The record is devoid of affidavits of experts or other competent evidence as to why the results of the tests might be comparable *at all* under these circumstances. Thus, so far as the record shows, the alumina used in Yngve might even be unexpectedly superior to appellants' alumina. Moreover, even were we to accept appellants' contention that "a comparison *can* be made as to the *trends* caused by variations in the amounts of alumina of Yngve and appellants," the most that could be said is that appellants have established a *difference* between the effect of their alumina and the effect of Yngve's alumina. The record contains nothing, other than attorney's arguments, which would indicate that the difference would not have been expected by the skilled in the art.

Appellants' specification does show that a particular resin composition having 10% of their alumina had substantially higher impact strength than the same composition containing 10% of an alumina known as "Boehmite." However, again the record is lacking in competent evidence—concerning the nature of Boehmite, and that the difference found would have been unexpected—and attorney's arguments cannot take the place of evidence.

As to "gellification" times, nothing is presented showing the effect of appellants' alumina as compared with *any* prior art alumina. Thus appellants have failed to establish *any* difference over the prior art, much less any unexpected difference. *Cf.* In re Klosak, *supra*, 455 F.2d at 1080, 59 CCPA at ——.

The decision of the board is affirmed.

Affirmed.