**Application of Werner SCHWARZE and Wolfgang Weigert.**

**Patent Appeal No. 76–534.**

United States Court of Customs and Patent Appeals.

June 30, 1976.

14. Vol. 4, p. 124, of the 1972 report by the Commission on Government Procurement.

**1374**

Michael J. Striker, Striker, Striker & Stenby, Evelyn Sommer, New York City, attys. of record, for appellants.

Joseph F. Nakamura, Washington, D.C., for the Commissioner of Patents, Jack E. Armore, Washington, D.C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

BALDWIN, Judge.

This appeal is from the decision of the Patent and Trademark Office Board of Appeals (board) affirming the examiner's rejection of claims 4, 5, 8, 11, and 12 in application serial No. 53,984, filed July 10, 1970, entitled "Process for Making Isothiocyanates." We affirm.

*The Invention*

The rejected claims are directed to a process for preparing isothiocyanates. In the first step, a triazine compound is reacted with a dithiocarbamate to form the dithiocarbamate of the triazine. In the second step, the dithiocarbamate of the triazine is decomposed into a mixture of mercaptotriazine and an isothiocyanate. The isothiocyanate is then isolated from the decomposition mass. Claim 12, the only independent claim, is illustrative:

12. The process of making isothiocyanates of the formula

$$R - N = C = S \qquad (I)$$

in which R has the meaning given below

comprising reacting

(A)  one mole of a triazine compound of the formula

$$(II)$$

in which X is

chlorine, SR′, OR′ or NHR′, R′ being alkyl of 1 to 4 carbon atoms,

with (B) two or three moles of a dithiocarbamate of the formula

$$\underset{\displaystyle RHN - \overset{\displaystyle\overset{S}{\|}}{C} - S - Me}{} \qquad\qquad (III)$$

wherein R is alkyl of 1 to 6 carbon atoms, cyclohexyl phenyl, benzyl or phenyl ethyl and Me is an alkali metal atom, in a first stage exothermic reaction within the temperature range of about 0 to 50° in the presence of water as solvent or of a homogeneous or heterogeneous mixture of water and an inert organic solvent, whereby the bis- or tris-dithiocarbamate of the triazine is formed, whereupon, thereafter, in a second reaction stage, for a period of at least one hour, the latter product is maintained at about the temperature previously reached or further heat is applied within the temperature range of about 0 to 100°C until the product is decomposed into a mixture of mercaptotriazine and the isothiocyanate of formula (1), followed by isolation of the isothiocyanate of formula (1) from the decomposition mass after or upon separation of the mercapatotriazine.

---

Claims 4, 5, 8, and 11 are each individually dependent upon claim 12. Claim 4 specifies the use of steam distillation or extraction to separate the mercaptotriazine and isothiocyanate. Claim 5 recites certain specific triazine compounds, namely cyanuric chloride, 2-methylmercapto-4,6-dichlorotriazine,n-butoxy-4,6-dichlorotriazine, and 2-ethylamino-4,6-dichlorotriazine. Claim 8 further limits the second stage of the process to a temperature above the temperature of the reaction between the triazine and dithiocarbamate. Claim 11 further defines the dithiocarbamate reaction component.

*The Rejections*

The following references were relied upon:

| | | |
|---|---|---|
| Claudin | 2,338,902 | Jan. 11, 1944 |
| Valenzin | 3,139,350 | June 30, 1964 |
| Cometti et al. | 3,288,831 | Nov. 29, 1966 |
| Werres | 3,406,191 | Oct. 15, 1968 |
| Higson (British) | 857,166 | Dec. 29, 1960 |
| Toyama Chem. (Jap.) | 42-10,498 | June 7, 1967 |

---

The board sustained the examiner's rejection of claims 5, 8, 11, and 12 as obvious under 35 U.S.C. § 103 over Valenzin and Higson in view of Cometti et al., Claudin, or Toyama Chem. (hereinafter Toyama). The board also sustained the rejection of claim 4

**1376**

over the above-cited combination, further in view of Werres.

The board noted that Valenzin discloses the first stage of the claimed process, albeit at a higher temperature (60 to 90°C.) than that of the claimed reaction (0 to 50°C.), but considered this difference in temperature to be an obvious variation. Moreover, the board stated that Higson suggests that a lower temperature range (30 to 60°C.) would be operable in this first stage and, furthermore, that condensates of cyanuric chloride with bis-dithiocarbamate salts decompose upon heating at about 180°C. Since Valenzin discloses that the bis-dithiocarbamate compounds react in the same manner as the alkyl dithiocarbamates, the board reasoned that it would be expected that thermal decomposition would also take place with the condensates containing alkyl dithiocarbamate residues.

The board found that each of the secondary references to Toyama, Cometti et al., and Claudin suggests that isothiocyanates may be obtained from the decomposition mass resulting from the thermal treatment of the condensates since, although the particular compounds decomposed in these secondary references are not the same as those decomposed in appellants' thermal treatment of their condensates, the reaction mechanism appears to be the same and an isothiocyanate is obtained in each instance. Therefore, the board held that one skilled in this art would expect that other dithiocarbamate compounds, i. e., those of Higson and Valenzin, would likewise decompose to produce the corresponding isothiocyanates.

With respect to claim 4, the board found that Werres discloses the use of steam distillation to isolate methyl isothiocyanate from a reaction product containing it.

Furthermore, the board found that claim 8, which limits the second stage of the process to a temperature "above the temperature of the reaction between the triazine

compound and the dithiocarbamate," is also obvious since the increase in temperature would depend upon the stability of the compounds to be decomposed. Thus, the board stated, the use of higher temperatures would involve no more than the routine ability of a chemist in this field. Finally, the board noted that Higson discloses that his compounds may be prepared at 30 to 60°C. and decompose at 180°C., thus suggesting that the second stage of appellants' reaction be carried out at a "higher" temperature.

### Solicitor's Arguments Concerning "Reasons of Appeal"

The sole "reason of appeal" given in the instant case reads as follows:

The reason for appeal is because the examiner erred in refusing to allow the application.

The solicitor argues that this reason of appeal does not comply with the statutory mandate in 35 U.S.C. § 142[1] and, therefore, the appeal should be dismissed. The solicitor believes that the instant case may be distinguished from *In re Castner,* 518 F.2d 1234, 186 USPQ 213 (Cust. & Pat.App.1975), in which a "broad, all-encompassing" reason of appeal was held sufficient, since, in the instant case, the reason of appeal ambiguously refers to error by the *examiner* (and not the *board*) in refusing to allow the application and fails to identify any claims. Furthermore, the solicitor argues that appellants implicitly recognize that their reason is insufficient by presenting the "Assignment of Errors" in their brief. Finally, the solicitor reasons that since this court requires (Rule 3.1(b)) that "a concise statement of errors of law and fact complained of" be filed for customs appeals, whereas all that is required for patent appeals is a petition of appeal (Rule 4.1(a)), it may be inferred that the "reasons of appeal" in 35 U.S.C. § 142 filed with the Commissioner will supply the court with the "concise

---

1. When an appeal is taken to the United States Court of Customs and Patent Appeals, the appellant shall give notice thereof to the Commissioner, and shall file in the Patent and Trademark Office his *reasons of appeal,* specifically set forth in writing, within such time after the date of the decision appealed from, not less than sixty days, as the Commissioner appoints. [Emphasis added.]

statement of errors of law and fact complained of" in patent appeals. Otherwise, the solicitor concludes, this court would require "concise statements" in customs appeals but not in patent appeals.

## OPINION

### Reasons of Appeal

We note at the outset that if appellants' reason of appeal is found to be inadequate, we must dismiss the present appeal for lack of jurisdiction.[2] *In re Wesselman,* 127 F.2d 311, 29 CCPA 988 (1942). *Contra, In re LePagés Inc.,* 312 F.2d 455, 458, 50 CCPA 852, 856 (1963), (Rich, J., concurring). We believe that the common sense approach discussed in *In re Castner,* supra at 1238, 186 USPQ at 217, should be applied in this case as well, and conclude that, on this record, the reason of appeal does satisfy the requirements of 35 U.S.C. § 142. Appellants' reason of appeal in the instant case can, of course, be distinguished from that which was held to be sufficient in *Castner,* but, as in *Castner,* the solicitor in the instant case has not alleged that he has been misled by appellants' reason of appeal in preparing the Commissioner's case before us, and the solicitor's brief lucidly discusses and argues the rejection raised by the examiner and affirmed by the board. To dismiss the present appeal under these circumstances would place form over substance and benefit no one. *Id.*

### Obviousness Rejection

Turning to the merits of the present appeal, we are of the opinion that the prior art, taken as a whole, would render obvious appellants' claimed process. We agree with the board, and appellants do not appear to challenge the fact, that Valenzin discloses the first step of the claimed process, albeit at a higher temperature. Appellants allege no criticality in the difference between the upper limit (50°C.) of the claimed range and the lower limit (60°C.) of the range disclosed by Valenzin. *In re Aller,* 220 F.2d 454, 42 CCPA 824 (1955). Moreover, Higson suggests the use of a lower temperature in this first stage of the reaction.

We also agree that the second stage of the claimed process, the thermal decomposition of the intermediate product, is suggested by Higson, who discloses that condensates of cyanuric chloride with bis-dithiocarbamate salts decompose upon heating. We agree with the board that in view of Higson's teachings, it would be expected that thermal decomposition will take place with the Valenzin products. We note that appellants do not allege any criticality in the claimed time or temperature range for the thermal decomposition. *In re Aller,* supra.

We also agree with the board that the secondary references disclose that isothiocyanates may be obtained from the decomposition mass resulting from the thermal treatment of dithiocarbamates. Claudin, for example, discloses that a dithiocarbamate will split into the corresponding isothiocyanate and mercapto-type compound. Although none of the secondary references disclose the decomposition of the specific triazine polyester intermediate of appellants, such decomposition would be expected since the compounds of both appellants and the references are members of the same class (dithiocarbamates), both are split into isothiocyanates and mercapto-type compounds, and both reactions appear to proceed by the same reaction mechanism. See *In re Persinski,* 433 F.2d 822, 58 CCPA 729 (1970); *In re Mehta,* 347 F.2d 859, 52 CCPA 1615 (1965). The secondary references also disclose the separation of isothiocyanates from reaction mixtures containing them. Thus, in our opinion, the examiner has established a case of prima facie obviousness which appellants have failed to rebut. Cf. *In re Freeman,* 474 F.2d 1318, 177 USPQ 139 (Cust. & Pat.App. 1973); *In re Klosak,* 455 F.2d 1077, 59 CCPA 862 (1972); *In re D'Ancicco,* 439 F.2d 1244, 58 CCPA 1057 (1971).

---

**2.** The Trademark Act was amended by Pub.L. No. 93–600, 88 Stat. 1955 (1975), which changed § 21(a)(2), (3), and (4) (15 U.S.C. § 1071) to eliminate the requirement for Reasons of Appeal in trademark cases.

We also believe that claim 4 is obvious in view of the teachings of Werres that steam distillation, is a known method of separating methyl isothiocyanate from a reaction mixture containing it. Finally, we agree with the board that claim 8, which limits the second stage of the reaction to a temperature "above the temperature of the reaction between the triazine compound and the dithiocarbamate," is obvious since the increase in temperature would depend upon the stability of the compounds to be decomposed and the use of higher temperatures would be obvious to one having ordinary skill in this art.

Accordingly, the rejection of claims 4, 5, 8, 11, and 12 is *affirmed.*

AFFIRMED.